IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RODNEY NOCKS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 08-59-SLR |
| | ) |
| MICHAEL ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

John S. Grady, Esquire of Grady & Hampton LLC, Dover, Delaware. Counsel for Plaintiff. Of Counsel: Anthony R. Mignini, Esquire of Mignini & Raab, LLP, Bel Air, Maryland.

David C. Weiss, Esquire, Acting United States Attorney, District of Delaware, and Dina White Griffin, Esquire, Special Assistant United States Attorney, District of Delaware, Counsel for Defendant. Of Counsel: Eric P. Kressman, Esquire, Acting Regional Chief Counsel, and Quinn Niblack Doggett, Esquire, Assistant Regional Counsel of the Office of General Counsel, Philadelphia, Pennsylvania.

**MEMORANDUM OPINION**

Dated: June 15, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Rodney J. Nocks, II ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-83. Plaintiff has filed a motion for summary judgment asking the court to award him DIB and SSI benefits or, alternatively, remand the case for further proceedings. (D.I. 16) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm his decision and enter judgment in his favor. (D.I. 19) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for DIB and SSI on September 27, 2004 alleging disability since November 1, 2001 due to "back pain, depression, anxiety, asthma, hypertension and hyperlipidemia." (D.I. 14 at 170, 39) Plaintiff was 23 years old on the onset date of his alleged disability and 26 years old at the time his application for benefits was filed. (Id.)

---

[1] Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

His initial application was denied on February 25, 2005 and upon his request for reconsideration on June 18, 2005. (Id. at 39, 48) Plaintiff requested a hearing, which took place before an administrative law judge ("ALJ") on February 6, 2007. After receiving testimony from plaintiff, plaintiff's wife, plaintiff's father, and a vocational expert ("VE"), the ALJ decided on May 3, 2007 that plaintiff is not disabled within the meaning of the Social Security Act, specifically, that plaintiff can perform other work that exists in the national economy. (Id. at 27) Plaintiff's subsequent request for review by the Appeals Council was denied. (Id. at 8) On January 28, 2008, plaintiff brought the current action for review of the final decision denying plaintiff DIB and SSI. (D.I. 2)

### B. Plaintiff's Non-Medical History

Plaintiff is currently 31 years old. He has a high school education and took several college courses in 2005. (D.I. 14 at 614) His past relevant work consists of case washing in a poultry plant. (Id. at 615-16) This work was characterized as "light duty" by the VE; it involved standing and walking most of the time, exposure to moisture and humidity (but no pulmonary irritants), and lifting no more than 20 pounds. (Id. at646, 616) Plaintiff has not worked since 1999. (Id. at 616)

### C. Medical Evidence[2]

#### 1. Physical impairments

[2]Plaintiff has the burden of supporting his motion for judgment before this court with evidence of record; its blanket attempt to "incorporate[ ] by reference all of the medical evidence contained in the record in this case," consisting of over 300 pages, is inappropriate. (D.I. 16 at 10) The court notes those records which are cited and primarily relied upon by plaintiff in his papers. Similarly, the court notes that plaintiff's attempt to "incorporate[ ] herein and request[ ] to be made a part hereof the arguments of plaintiff's counsel to the Appeals Council" shall be disregarded. The court considers those arguments before it on the current motion and related papers.

Plaintiff was treated at Milford Memorial Hospital on May 11, 2002 for chest pain. (D.I. 14 at 232) At that time, it was noted that plaintiff had normal respiration and was on several prescription and over the counter ("OTC") medications for asthma, depression, and stomach upset: Singulair, Advair, Toprol, Wellbutrin, Valium, Prozac, Effexor, Prevacid, and Prilosec. (*Id.*) Plaintiff's chest diagnostic study revealed no evidence of heart disease. (*Id.* at 240). A cat scan taken May 17, 2002 showed a normal brain and osteoarthritis of the lower lumbar spine, evidenced by facet hypertrophy, sclerosis and osteophytes at the L4 L5 and L5 S1 levels. (*Id.* at 242)

Plaintiff presented to the Milford Memorial Hospital on September 10, 2002 with low back pain and complaints of chest and right ankle pain. (*Id.* at 244) Emergency room notes indicate that plaintiff was taking Vioxx (for pain), Skelaxin (a muscle relaxant), and Ambien (a sleep aid) at that time. (*Id.*) Films of plaintiff's abdomen and lumbar spine were normal. (*Id.* at 250-52)

Plaintiff was treated at the Bayhealth Medical Center on October 24, 2002 for complaints of "pain from head to toe." (*Id.* at 253) Plaintiff's examination was normal and he was given Darvocet for pain[3] and counseled to use a heating pad. (*Id.*) Diagnostic studies taken November 12, 2002 of plaintiff's neck, back, shoulders, and knees were normal with the exception of evidence of a previous ligament repair in the

---

[3]Plaintiff's medications at that time, in addition to the Darvocet, included: Advair (asthma), Toprol (angina/hypertension), Zocor (cholesterol), Naproxen (pain/inflammation), Effexor (antidepressant), Singulair (asthma), Lotrel (blood pressure), Prevacid (reflux), Clarinex (antihistamine), Avalide (blood pressure), Diazepam (anxiety), Ambien (sleep), and Reglan (reflux).

left knee.[4]  (*Id.* at 263)

Plaintiff first treated with Dr. Maged I. Hosny, M.D. ("Hosny"), a rheumatologist with the Cedar Tree Medical & Surgical center in Long Neck, Delaware, on October 31, 2002. (*Id.* at 347)  Plaintiff complained of daily muscular pain, at times associated with "whole body stiffness." (*Id.*)  Upon examination, Hosny noted the absence of synovitis in any joints but noted "multiple tender points" in plaintiff's musculature. (*Id.*)  Hosny's assessment was "[m]ultiple myofascial tender points are responsible for the pain, although the patient does not have enough criteria for the diagnosis of fibromyalgia,[5] so I will call it myofascial tender points for now." (*Id.*)  Joint x-rays and other tests were ordered. (*Id.*)

Hosny saw plaintiff again on November 12, 2002, at which time he noted that "Darvocet and Skelaxin are controlling [plaintiff's] pain." (*Id.* at 410)  He noted "tenderness over multiple tender points" but "not enough to make [a] diagnosis of fibromyalgia." (*Id.* at 411)  In the "diagnosis" section of the report, however, Hosny wrote: "fibromyalgia active –> currently on Darvocet . . . potential for habituating - tolerance is [increased] with Darvocet" and "elevated RF of unclear etiology at the present time." (*Id.*)

On April 11, 2003, Hosny again evaluated plaintiff for chronic muscular pain, noting multiple tender points, and that plaintiff's pain is "under better control with Mobic

---

[4]Later records describe this as an ACL repair.  (D.I. 14 at 269)

[5]Fibromyalgia syndrome is a rheumatic condition whose characteristics include widespread muscle and joint pain, fatigue, and other symptoms. *See* http://www.webmd.com/fibromyalgia/guide/arthritis-fibromyalgia.

4

[and] Ultracet [and] Skelaxin." (*Id.* at 404) He noted on this date increased "multiple tender points – consistent with fibromyalgia." (*Id.*) The diagnosis was "Fibromyalgia – active – seems to be under reasonable control with [ ] Ultracet [and] Mobic [and] Skelaxin." (*Id.* at 405) In June 2003, Hosny recommended the use of heating pads on plaintiff's back to assist with "severe pain," but described plaintiff's fibromyalgia as "under reasonable control" with medications. (*Id.* at 403)

Plaintiff was evaluated by Dr. Jona Gorra, M.D. ("Gorra") on August 31, 2003 at the request of the Delaware Disability Determination Service. Gorra noted a history of depression, anxiety, stomach upset, headaches, and asthma. She also noted that plaintiff was diagnosed with fibromyalgia five years prior. (*Id.* at 268) Plaintiff reported that he can walk half a mile before he gets shortness of breadth or wheezing. (*Id.* at 269) He also described having reflux for three years. (*Id.*) He complained of joint and back pain. (*Id.*)

Upon examination, Gorra noted that plaintiff was able to ambulate normally and climb onto and off of the examination table without assistance. (*Id.*) She noted a muscle strength of "5/5." (*Id.* at 270) Plaintiff "was able to squat [and] bear weight on each leg." (*Id.*) She noted "no wheezing, no rales and no rhonchi" or use of plaintiff's accessory muscles such as may evidence a respiratory problem. (*Id.*) Gorra noted "no limitations" on plaintiff's range of motion. (*Id.* at 271-74) Gorra found point tenderness in plaintiff's back, neck, and scapular area as well as the "low cervical area," "second ribs areas" and "proximal joint line of both knees." (*Id.* at 270) Gorra's diagnoses were: (1) "anxiety and depression which is uncontrolled"; (2) fibromyalgia which is not

5

controlled with the pain medications"; (3) "bronchial asthma which is poorly controlled"; and (4) "GERD which is also poorly controlled."[6] (*Id.*)

Hosny continued to treat plaintiff for back pain and consistently reported that plaintiff had active fibromyalgia between August 2003 and November 2004. (*Id.* at 401 (Aug. 2003), 399 (Oct. 2003), 397 (Jan. 2004), 395 (Mar. 2004), 393 (May 2004), 391 (Aug. 2004), 383 (Nov. 2004))

On November 24, 2004, Plaintiff submitted a "Function Report" to the Social Security Administration. Plaintiff stated that he wakes up at noon and goes to sleep between 10 to 11 p.m. (*Id.* at 182) Plaintiff provided that he could no longer play sports or exercise since the onset of symptoms, and that he has pain even when laying down. (*Id.* at 183) He stated that he can not stand for long to cook, that he cleans and rakes leaves a couple of times per month, but that he needs someone to help him finish these tasks. (*Id.* at 184) Plaintiff reported feelings of paranoia and avoiding social activities. (*Id.*) Additionally, plaintiff claimed that his disability affects his abilities to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and use his hands. (*Id.*)

A "Pain Questionnaire" was submitted by plaintiff on the same date. In that submission, plaintiff indicated that he could not write more than five minutes due to pain, and that it hurts to stand and "sometimes to sit." (*Id.* at 191) Plaintiff stated that the pain affected his sleep. (*Id.*) On December 2, 2004, Hosey noted that plaintiff's

---

[6]Gorra noted that, as of that time, plaintiff was on the following medications: Effexor, Tylenol with codeine (pain); Clarinex, Toprol, Ultracet (pain); Tizanidine (muscle relaxant), Diazepam, Prozac (depression), Advair, Avalide, Lotrel, Mobic (an anti-inflammatory drug), Singulair, Prevacid, and Zocor. (D.I. 14 at 269)

6

fibromyalgia "seems to be quiescent at the present time." (*Id.* at 380) He also reported that plaintiff's neck and back pain were "better." (*Id.* at 379)

In March 2005, plaintiff submitted a "Disability Report- Appeal" to the Social Security Administration in which he reported "more muscle swelling" and "numbness." (*Id.* at 206) He reported issues with intimacy. (*Id.* at 210)

On February 14, 2005, plaintiff was examined by Kartik Swaminathan, M.D. ("Swaminathan") on behalf of the Delaware Disability Determination Service. (*Id.* at 312) Upon examination, Swaminathan reported that plaintiff is "moderately obese" and has no "protective posturing" or "abnormal gait." (*Id.* at 313) He noted "diffuse tenderness over the cervical, thoratic and lumbar spine with minimal to myofascial tenderness over bilateral trapezius." (*Id.*) Plaintiff had no active trigger points and a normal range of motion in all muscles and joints. (*Id.*) His grip strength, fine hand coordination, range of motion of the lumbar spine, ankle and knee tendon reflexes were all within normal limits. (*Id.*) Plaintiff completed a straight leg raising test and lower extremity minor muscle testing. (*Id.*) Swaminathan's impression was as follows:

> There appears to be a clinical history of fibromyalgia; however, it doesn't seem to be active at this present time. There is no evidence of any focal arthritis, no focal wasting of any muscles, or any range of motion impairment at this present time. There is also clinical history of anxiety and [plaintiff] is on treatment for the same.

(*Id.* at 314)

A "Physical Residual Functional Capacity Assessment" was executed on February 22, 2005 by a state agency physician following an examination of plaintiff.[7]

---

[7]It is not clear whether Swaminathan was the physician; the majority of the handwritten notes accompanying this report are illegible, as is the signature.

7

(D.I. 315-23) In this report, the physician indicated that plaintiff had a "med[ium] RFC." (*Id.* at 326) More specifically, it was indicated that plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, sit, stand and/or walk for about 6 hours in an 8-hour workday, and that plaintiff had no limitations on pushing or pulling. (*Id.* at 316)

On March 7, 2005, Hosny wrote a prescription for plaintiff stating that he "is unable to work at the present time" due to fibromyalgia. (*Id.* at 441) On April 15, 2005, Hosny executed a "Physician's Statement" indicating that he had diagnosed plaintiff with fibromyalgia. (*Id.* at 373) Hosny indicated that plaintiff informed him that he suffers from fatigue and chronic pain and "on some days his condition is such that he feels so little energy and that he is so tired that he spends the entire day either in bed or lying on the couch," which condition may last "for several days or even weeks at a time." (*Id.*) He "sometimes" "is able to function on a higher level." (*Id.*) In view of the foregoing, it is Hosny's opinion that plaintiff "would not be able to maintain any kind of regular employment where he would be required to go to work and sustain regular work on an everyday, 8 hour per day basis." (*Id.*) Further, in the event plaintiff "would attempt to exert himself at a regular job or on sustained activities, in my opinion, he would suffer for the activities the next day. Even if [plaintiff] was able to occasionally do any work, it is my opinion that it would adversely affect his health and he certainly would not be able to sustain this kind of work." (*Id.* at 374)

On May 31, 2005, plaintiff was assessed by Michael R. Samaha, M.D. ("Samaha") at the Sleep Disorders Center of Bayhealth Medical Center. Plaintiff complained of "excessive daytime sleepiness" and "non-refreshed sleep." (*Id.* at 500)

8

Samaha noted that plaintiff had a sleep efficiency of 85% but had many interruptions and "obstructive events" such as apneas. (*Id.*) Samaha recommended that the study be repeated "for optimal CPAP titration,"[8] and "strongly advised" exercise and dieting. (*Id.* at 501) Plaintiff completed a CPAP study and, on August 18, 2005, Samaha diagnosed plaintiff with "[m]oderate obstructive sleep apnea" and prescribed a chin strap and medium nasal mask to sleep with. (*Id.* at 484) Samaha "reemphasized the importance of compliance" and, upon plaintiff's request, issued him a note to return to work. (*Id.* ("He needed a note stating that he can go back to work, which was given."))

On August 3, 2005, Hosny wrote a new prescription for plaintiff, stating that "[t]his note is in writing to state that Rodney Nocks can work full time with no restrictions." (*Id.* at 441)

At a follow up with Samaha on October 27, 2005, Samaha noted that plaintiff was using his chin strap consistently and "feels a significant improvement in his symptoms with more energy," did not feel drowsy in the morning, and "wakes up refreshed and does not feel sleepy during daytime." (*Id.* at 485) Plaintiff had also started exercising and had lost two pounds. (*Id.*) Samaha encouraged plaintiff to continue with the chin strap and to continue exercising and losing weight. (*Id.*)

Plaintiff began treatment with Mansour Saberi, M.D. ("Saberi") for potential hypogonadism in December 2005.[9] At a follow up examination on January 10, 2006,

---

[8]CPAP stands for continuous positive airway pressure. Generally, CPAP allows a patient with sleep apnea to achieve restful sleep without interruption. A nasal or full-face mask is worn by a patient which establishes positive airway pressure, keeping the airway open and unobstructed.

[9]Generally, a condition affecting the function of the testes.

9

plaintiff "denie[d] any muscle ache or any difficulty walking around." (*Id.* at 511)  His
physical examination was unremarkable.  (*Id.*)  Plaintiff stated that he and his wife were
trying to have a baby. (*Id.* at 512)  On April 24, 2006, plaintiff told Saberi that he was
taking Lyrica for "abnormal movement of the legs" related to fibromyalgia. (*Id.* at 510)
Plaintiff was still taking Lyrica through October 2006, but reported to Saberi that he was
no longer taking medication for depression at that time.  (*Id.* at 504)

On November 10, 2006, Bonnie S. Yoder, MSN, RNCS, FNP ("Yoder") of Family
Health of Georgetown executed a letter to plaintiff's counsel in this matter.  Yoder
stated that she has been seeing plaintiff since February 2002[10] and that, during this
time, she has seen plaintiff attempt to hold down jobs but that plaintiff has been largely
unsuccessful "due to the amount of pain that he experiences." (*Id.* at 213)  She also
indicated that plaintiff has been unable to complete many college courses because
"[w]ith the multifactoral disease process, sitting for long periods of time is difficult and
concentration is almost impossible." (*Id.*)  Yoder indicated that she was currently
"working with the following diagnosis: hypertension, hyperlipidemia, metabolic
syndrome, sleep apnea requiring a CPAP machine, moderate persisting allergic rhinitis,
migrane headache, fibromyalgia, restless leg syndrome, insomnia, GERD, major
depressive disorder, and generalized anxiety disorder." (*Id.*)  Additionally, plaintiff had
been recently diagnosed with "hypogonadism related to pituitary hypothalamic." (*Id.*)

---

[10]A multitude of handwritten treatment notes from Yoder are of record, which
appear to cover the date ranges of April 20, 2002 through March 29, 2005 and October
6, 2005 through January 22, 2007. (D.I. 14 at 327-52, 530-84)  The records are too
numerous (and illegible) to detail.  The court will address plaintiff's general citation to
these records in its discussion of plaintiff's arguments.

## 2. Mental health

Plaintiff was evaluated by Randy Rummler, M.D. ("Rummler") on behalf of the

Delaware Disability Determination Service on September 6, 2003 for his complaints of

depression and pain. (Id. at 276)  Rummler noted plaintiff's fibromyalgia and poor sleep

as well as anxiety attacks which, according to plaintiff, "can cause his muscles to tense

up and cause muscle pain." (Id.)  Plaintiff stated that he reads during the day. (Id.)

Plaintiff stated that he is "depressed over 50% of the time" and that his "energy is

improved on medications."[11] (Id.)  Rummler noted that plaintiff was "animated when

observed talking to another patient outside the office" but displayed somewhat inhibited

motor activity when interviewed. (Id. at 277)  Rummler noted "major depression, mild"

and a global assessment of functioning score ("GAF") of 60. (Id.)  Rummler also noted

that plaintiff was "alert and oriented X 3 with attention and concentration intact, as

assessed through a discussion of the patient's own history." (Id.)  Rummler's

"impression and recommendation" included the following:

> The patient's presentation of fibromyalgia at age 20 . . . seems unusual in onset.
> The fact that despite, according to the patient, being unable to work for the last
> five years due to these symptoms, they are hardly discussed on review of
> medical records from his primary care physician, suggest a discrepancy in the
> patient's relating his history and the actual history at hand.  The overall
> guardedness of the patient has the appearance of being present to minimize the
> patient's functionality. . . . Before any final decisions being made regarding the
> patient's impairment in terms of working, a recommendation for psychological
> testing is made and should be pursued[.]

(Id. at 278)  Rummler also filled out a "Psychological Functional Capacities Evaluation

---

[11]Rummler indicated that plaintiff was on 14 medications at that time. (D.I. 14 at
277)

11

Form,"[12] on which he indicated "moderate" impairments on plaintiff's: ability to relate to others, restriction on daily activities, constriction of interests, ability to sustain normal work performance, and ability to cope with pressures of normal work. (Id. at 279-80) He noted "mild" deterioration of personal habits and a "mild" inhibition on plaintiff's ability to perform routine, repetitive tasks under supervision, and no impairment on plaintiff's ability to understand or carry out instructions. (Id.) An additional comment of "reliability of [patient]'s self report in question" was noted. (Id. at 280)

Plaintiff treated with Coastal Therapeutic Services ("CTS") several times between April 2003 and July 2005. (Id. at 418-26) On September 30, 2003, plaintiff reported feeling "pretty good" and that he has been "sleeping well and has been feeling pretty good overall." (Id. at 425) Plaintiff noted "a good level of energy," good mood, and that "chronic pain [was] a little improved." (Id.) He denied side effects from his medications. (Id.) Plaintiff "provided a form for vocational rehab[ilitation], who will assist with his future funding to attend school." (Id.) Plaintiff stated that he read five books in the last two months and felt "his retention [was] good." (Id.)

Plaintiff presented at the Milford Memorial Hospital on February 19, 2004 with depression. (Id. at 285) He had been walking in the woods "for hours" prior to admission. (Id. at 288) He "allude[d] to the fact that he is very depressed because of his relationship with his father." (Id. at 285) Plaintiff reported a history of sexual abuse and feelings of "helplessness and hopelessness" due to his father's assertion of control

---

[12]This form appears to be dated September 5, 2007. (D.I. 14 at 280) There is no indication that Rummler examined plaintiff on multiple occasions. The parties do not address this possible discrepancy in their papers.

over his life. (*Id.* at 288) Plaintiff was discharged on February 26, 2004 after doing "fairly well" in the adult inpatient unit of the hospital and appearing to be "not psychotic" or suicidal. (*Id.* at 289) At the time of his discharge, Criselda Abad-Santos, M.D. diagnosed plaintiff with "major depressive disorder" and noted a GAF of 50. (*Id.* at 289) He was referred back to "his outpatient psychiatrist."[13] (*Id.*)

Plaintiff followed up with CTS on March 3, 2004. (*Id.* at 424) At that time, it was noted that plaintiff stated that "he has been doing pretty well 'lately'," and was "keeping up with his course work and has been getting acceptable grades." (*Id.*) With respect to his hospitalization, plaintiff stated that he was "upset and challenging [himself] to walk out on thin ice." (*Id.*) According to plaintiff, his "car broke down and [he has] been under stress from lots of things." (*Id.*) Plaintiff caught up in all but one school course and was "doing passing work at school." (*Id.*) An improvement in mood was noted (now characterized as "neutral") and plaintiff was "attentive [and] occ[asionally] joke[d] with the examiner." (*Id.*) Plaintiff would "smile appropriately" and "no psychosis, no odd associations or loosening of associations" or "first rank symptoms" were noted. (*Id.*)

A "Psychiatric Review Technique" form was executed on January 12, 2005 by Christopher Kim, Psy.D. ("Kim") of the Delaware Disability Determination Service. (*Id.* at 427) Kim noted that plaintiff is "no longer receiving mental health care." (*Id.* at 439) Upon evaluation, Kim concluded that plaintiff has an "affective disorder" that is "not severe." (*Id.* at 427) Kim also noted "disturbance of mood" and "mild depression." (*Id.*) Kim found no limitations on daily activities and no episodes of decompression; "mild"

---

[13]It is unclear to the court to whom this referred.

13

limitations on maintaining social functioning, as well as on "concentration, persistence or pace," were noted. (*Id.* at 437) Kim concluded that his "alleged functional limitations are primarily physical in nature" and that "his mental impairment is not severe." (*Id.* at 439)

## D. Hearing Before the ALJ

### 1. Plaintiff's testimony

Plaintiff lives with his wife and four stepchildren, currently aged 12 through 18. (*Id.* at 617-18) He testified that he drives only when necessary, such as for a medical appointment, otherwise he spends his days reading and cleaning. Plaintiff regularly attends church. (*Id.* at 618) He is 5'10" tall and approximately 280 pounds. (*Id.* at 681)

Plaintiff can stand 15 to 20 minutes without pain and gets pain with prolonged sitting. (*Id.* at 618-19) He can lift about 10 to 20 pounds. (*Id.* at 619) Plaintiff gets fatigued easily and is depressed. (*Id.*) He has asthma attacks approximately once per month. (*Id.* at 620) Plaintiff has a pituitary tumor that is being treated. (*Id.* at 620-21) Plaintiff admitted he had not seen Hosny in some time prior to the hearing but had treated once the prior week and received a cortizone shot. (*Id.* at 622)

Plaintiff testified that he has not worked since 1999. (*Id.* at 616) While in college in 2005, plaintiff worked at the computer lab for two semesters for about 20 hours per week. (*Id.* at 624) He tried working a handyman job in 2006 but quit after a week due to pain, weakness and swelling. (*Id.* at 623) Plaintiff missed some days of school in 2005 due to pain and anxiety attacks. He had a 3.0 GPA his first semester and a 1.25 GPA the second. (*Id.* at 625)

14

With respect to his fibromyalgia, plaintiff testified that at one point it would affect him every day, while other days its "not as bad." (*Id.* at 626)  Some days, "medication will make no difference at all." (*Id.*)  He has these "bad days" 10 to 15 days per month, which require laying down the "majority of the time" (for 6 to 8 hours). (*Id.* at 627-28)  Plaintiff testified that he takes Valium 2 to 3 times per month for anxiety and that it makes him drowsy; he avoids taking it every day for that reason. (*Id.* at 630)

Plaintiff stated that the shaking, muscle weakness, and lack of concentration caused by his fibromyalgia prevent him from working. (*Id.*)  Plaintiff's restless leg syndrome causes shaking every day (in addition to at night) and plaintiff generally controls his asthma with a nebulizer. (*Id.* at 629, 632)  Plaintiff has migraines about twice per week, generally in the morning. (*Id.* at 633)  He is on blood pressure medication and gets chest pains during periods of chronic fatigue. (*Id.* at 634)  He can lift 10 to 20 pounds but not regularly. (*Id.*)

## 2. Testimony of plaintiff's witnesses

Plaintiff's wife testified that plaintiff has lower back and shoulder pain, as well as chest pain. (*Id.* at 637)  Plaintiff will cook and clean occasionally when he is not in pain. (*Id.* at 639)  She also corroborated plaintiff's complaints of migraines. (*Id.* at 640)  In her opinion, plaintiff cannot work 40 hours per week due to pain. (*Id.*)

Plaintiff's father also testified at the hearing.  He testified that plaintiff frequently lies down from pain and the prior year was probably his worst for pain. (*Id.* at 643)  He used to think plaintiff could work, and this brought a division between them until he learned "how sick he really was." (*Id.* at 644)  Plaintiff's father does not believe plaintiff

15

can work full time. (*Id.*)

### 3. Vocational expert testimony

The hypothetical question that was asked by the ALJ was as follows:

[S]ay we have a hypothetical individual, younger individual, high school plus education, prior relevant work is similar to that of the claimant. . . . This hypothetical individual might be capable of performing work activity at a sedentary level of exertion as defined in the Dictionary of Occupational Titles with the following provisions: any jobs would have to be simple, routine in nature, wouldn't take a great deal of concentration, also wouldn't entail exposure to excessive pulmonary irritants, dust, fumes, humidity, those kind of things, also would not entail a great deal of public contact and also would offer a sit/stand option with the, you know, occasional change of posture for relief and discomfort. With those kind of limits, any jobs you could think of?

Based on this hypothetical, the VE testified that plaintiff could perform a limited number of light, unskilled jobs, such as a "printed circuit layout taper," a "final assembler of eye glasses," or a "button assembler." (*Id.* at 649) The VE stated that the Dictionary of Occupational Titles does not specifically reference a sit/stand option with respect to light work, but it is his opinion based on the review of the essential duties of each job that this option exists. (*Id.*) The VE acknowledged that, if plaintiff's hearing testimony were taken as persuasive, and plaintiff requires one hour of unscheduled rest three times per week, or missed three days per month, plaintiff would not be able to sustain employment. (*Id.* at 648, 652-53)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. See *Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). In

16

making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is

17

evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant

cannot perform his past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. The ALJ's Decision

The ALJ considered the medical evidence of record and testimony received at the hearing, and concluded that plaintiff retains the capacity for work and is not disabled as defined by the Social Security Act. The ALJ made the following enumerated findings.

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2005.

2. The claimant has not engaged in substantial gainful activity since November 1, 2001, the alleged onset date (20 C.F.R. §§ 404.1520(b), 404.1571 et seq.,

19

416.920(b) and 416.971 et seq.).

3. The claimant has the following severe impairments: fibromyalgia and asthma (20 C.F.R. § 404.1520© and 416.920©).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform light work as defined in the Dictionary of Occupational Titles, with no exposure to pulmonary irritants and jobs which are simple and routine in nature.

6. The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7. The claimant was born on November 13, 1977 and was 23 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. §§ 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1560©, 404.1566, 416.960©, and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2001 through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

## C. Analysis

Plaintiff argues that the ALJ's determination was not based upon substantial

evidence because it: (1) failed to properly weigh plaintiff's fibromyalgia; (2) failed to

properly assess the opinion of plaintiff's treating physicians; (3) erred in finding that

plaintiff's mental impairment was not severe; and (4) failed to properly consider the combination of plaintiff's impairments. (D.I. 16 at 13) The court considers these arguments within the appropriate context of the regulatory framework.

### 1. Step 2 determination (mental impairments)

The ALJ found that claimant's depression and anxiety disorder are not severe limitations. In support, the ALJ cited Rummler's September 6, 2003 diagnosis of "moderate" depression and Rummler's contemporaneous finding that plaintiff's attention and concentration was intact. (Id. at 19) Rummler indicated that plaintiff appeared animated outside of the examination room; he noted a GAF of 60 and questioned plaintiff's motivation, given his findings. (Id.) Additionally, the ALJ cited the September 30, 2003 progress notes from CTS wherein plaintiff described himself as feeling "pretty good overall" and confirmed he had no difficulties with energy, mood, retention, worrying, or sense of well-being. On examination, plaintiff's affect was only slightly restricted. (Id.)

The ALJ further noted that only one follow-up to plaintiff's February 2004 hospitalization appeared of record and that, during this March 3, 2004 examination, the examiner found plaintiff to be attentive, keeping up with school, and making occasional jokes. (Id.) In January 2005, Kim noted that plaintiff was no longer receiving mental health treatment and that he claimed to be "doing fine." (Id.) The ALJ further noted that plaintiff testified that he takes Valium only on an "as-needed" basis, 2 to 3 times per month. (Id.) Finally, the ALJ cited the lack of any medical evidence documenting that plaintiff's depression has caused any limitations in performing daily activities. The

ALJ described plaintiff's activities, such as attending school, doing some housework, driving and going to church, and noted that plaintiff has no difficulties following instructions, taking care of personal needs, or with decompensation. (*Id.*) Kim's opinion that plaintiff's impairment is not severe was, therefore, adopted as consistent with the evidence of record.[14]

Plaintiff argues that the ALJ trivialized his February 2004 hospitalization by stating that only one follow-up treatment note appears of record. Plaintiff calls out one additional treatment note, dated July 1, 2005, or nearly a year and 5 months after his hospitalization. (D.I. 16 at 21 & n.13[15]) The July 1, 2005 report is handwritten and largely illegible, however, there are check-marks next to several symptoms (*e.g.*, appetite disturbance, difficulty concentrating, memory problems, activity withdrawal, school problems, intrusive thoughts, dizziness) not noted by the ALJ, and a treatment plan of "support/maintenance" was circled. (D.I. 14 at 418, 421) A GAF of 40 was noted. (*Id.* at 421) In addition to the foregoing, plaintiff argues that the ALJ ignored Rummler's assessment of "moderate" limitations on plaintiff's daily activities. (D.I. 16 at 22)

---

[14]The ALJ also found that plaintiff's restless leg syndrome, acid reflux, migrane headaches, sleep apnea, osteoporosis, chest pain, heart problems with chest pain, high blood pressure and low testosterone "do not cause more than minimal limitations in the claimant's ability to perform basic work activities." (D.I. 14 at 20) Plaintiff does not contest this finding on appeal to this court.

[15]Plaintiff cites only to the list of exhibits, describing "medical records covering the period from 09/03/2003 to 07/01/2005 from [CTS]" as corresponding to exhibit B28F. That tab includes the relied-upon notes from March 3, 2004 (D.I. 14 at 424), a pre-hospitalization note dated September 30, 2003 (*id.* at 425), and the July 1, 2005 notes (*id.* at 421).

22

As detailed by the ALJ, the majority of the records with respect to plaintiff's depression and anxiety disorder do not indicate a moderate (let alone severe) impairment. Plaintiff expressed to CTS (his own provider) both prior to his brief hospitalization (in September 2003) and after his hospitalization (March 2004) that he was doing well. (D.I. 14 at 424-25) Plaintiff had not been receiving mental health treatment for some time prior to 2004. (Id. at 439)

The July 1, 2005 notes cited by plaintiff demonstrate that plaintiff's limitations were "moderate" at best. In the same report in which Rummler generally assessed "moderate" limitations on plaintiff's daily activities, Rummler also noted that plaintiff's affect changed between the waiting room and the examination room. Rummler specifically questioned plaintiff's reliability and, notwithstanding, noted only a "mild" inhibition on several abilities (such as performing tasks under supervision) and no inhibition on other activities (such as executing instructions). (Id. at 278-80)

In addition, as the ALJ noted, plaintiff successfully completed two semesters of college in 2005, and drives, attends church, and takes care of his own appointments. Because the ALJ was entitled to discredit the July 2005 assessment as well as Rummler's assessment in view of conflicting evidence of record, and because neither record truly supports a finding of a "severe" limitation in the first instance, the ALJ's decision at step 2 is affirmed.[16]

---

[16]Plaintiff does not seek review of the ALJ's determination that plaintiff's asthma is not a severe condition. In view of the July 1, 2005 notes, the ALJ's statement that "[t]here is no medical evidence documenting that the claimant's depression has caused any limitations in performing daily activities, including attending school in 2005 for two semesters at 20 hours per week, keeping up with his courseload, and maintaining acceptable grades" is partially incorrect; this was, however, harmless error in view of

23

## 2. Step 3 determination (regarding fibromyalgia)

The ALJ found that plaintiff's fibromyalgia does not meet or equal a listed criteria because there is no evidence of: (1) "gross anatomical deformity" together with medical imaging showing joint space narrowing, bony destruction or ankylosis; (2) nerve root compression, spinal arachnoiditis or spinal stenosis; (3) an inability to ambulate effectively or perform dextrous movements effectively; or (4) "involvement of two or more organs/body systems to at least a moderate level of severity with significant, documented, constitutional symptoms and signs of severe fatigue, fever, malise and weight loss." (*Id.* at 20-21) Plaintiff does not specifically refute any of these findings. Plaintiff asserts that, as described by the Seventh Circuit, fibromyalgia is an elusive condition with no particular cause or cure. (D.I. 16 at 15, citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)) Plaintiff argues that the ALJ was remiss in citing the lack of objective laboratory and clinical findings to support his ultimate determination that plaintiff's fibromyalgia is not incapacitating, in view of the fact that fibromyalgia, by its nature, is subjective. (D.I. 16 at 15, 19-20; *see also Chrupcala v. Heckler*, 829 F.2d 1269 (3d Cir. 1987))

The ALJ is required to evaluate a plaintiff's subjective complaints of pain, but is not permitted to base a finding of disability solely on such complaints. Even in fibromyalgia cases, the ALJ must compare the objective evidence and the subjective complaints and is permitted to reject plaintiff's subjective testimony so long as he provides a sufficient explanation for doing so. *See Prokopick v. Commissioner of Social*

---

the foregoing.

*Sec.*, 272 Fed. Appx. 196, 199 (3d Cir. 2008) (unpublished) (taking notice of the Seventh Circuit's statement that "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not") (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)). The court proceeds to review the ALJ's determination at step 5.

### 3. Step 5: opinions of plaintiff's medical providers

Plaintiff argues that the ALJ substituted his own opinion for that of Hosny and Yoder with respect to the effect of plaintiff's fibromyalgia. (D.I. 16 at 16-20) Plaintiff asserts that Hosny's treatment notes, which often reference plaintiff's pain and tender points, support his April 15, 2005 opinion that plaintiff is unable to sustain full time work. (*Id.* at 17) Additionally, plaintiff argues that Yoder's November 10, 2006 opinion that plaintiff cannot work is supported by her progress notes, which consistently reference plaintiff's diagnoses of fibromyalgia, asthma, hypertension, depression and anxiety. (*Id.* at 19) Plaintiff argues that the ALJ incorrectly concluded that Yoder's opinion is "not supported by treatment records from Family Health of Georgetown showing unremarkable physical examination findings, no neurological deficits, no abnormalities in the extremities, and **no documentation** of any ongoing complaints or symptoms." (D.I. 14 at 25) (emphasis added)

As plaintiff's treating physician, Hosny's opinion is entitled to special significance and, when supported by objective medical evidence of record and consistent with other substantial evidence of record, is entitled to controlling weight. *See Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ

cannot disregard the opinion of a treating physician without explaining the reasoning for rejecting the opinion and referencing objective medical evidence conflicting with the opinion. *See Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986). In contrast, Yoder, a nurse practitioner, is considered an "other source[ ]" whose opinion may be considered with respect to the severity of plaintiff's impairment and ability to work, but need not be assigned controlling weight. *See* 20 C.F.R. § 416.913(d)(1).

Where conflicting medical evidence is presented, the ALJ may properly resolve the conflict. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). With respect to Hosny's opinion, the ALJ stated that it was "not supported by medical signs and laboratory findings and is inconsistent with the record as a whole, including [ ] Hosny's own progress notes, documenting unremarkable clinical examination findings and a good response to treatment when the patient is compliant[,] as well as the claimant's self-reported activities of daily living" as previously summarized (and including driving, attending school, completing some cleaning, reading, and other activities). (D.I. 14 at 25) The ALJ cited Hosny's August 3, 2005 note that plaintiff "can work full time with no restrictions." (*Id.*) This note, as well as plaintiff's daily activities during the relevant period, create a clear conflict within the purview of the ALJ.

Plaintiff points to no medical findings that support Yoder's assessment that plaintiff cannot concentrate. The ALJ afforded Yoder's opinion "limited weight" because it "is nonspecific regarding the claimant's functional limitations and restrictions," and because her statement that it would be "almost impossible" for plaintiff to concentrate with his combination of ailments conflicts with Rummler's finding (that plaintiff's concentration and orientation was intact) as well as the evidence and testimony

26

regarding plaintiff's activities.  (*Id.*)  Plaintiff has, on numerous occasions, stated (and
demonstrated) that he can concentrate to a functional degree, for example:  plaintiff
passed two semesters of college, and regularly reads books (D.I. 14 at 71, 146, 618).[17]
In view of the foregoing, the ALJ did not commit error in discounting Yoder's opinion.

The ALJ relied on the state physician's February 2005 assessment that plaintiff
has the RFC to perform the demands of medium work, however, stated the following:
"giving the claimant every benefit of the doubt, and considering the claimant's history of
fibromyalgia with diffuse areas of tenderness and the likelihood that the claimant's
symptoms would be exacerbated by performing the lifting and carrying requirements of
medium work,[18] the undersigned finds that the claimant's exertional capacity is
somewhat more limited[.]" (*Id.* at 25)  The ALJ ultimately found that plaintiff could work
only simple, routine jobs with no exposure to pulmonary irritants.  (*Id.*)  This eliminated
plaintiff's past relevant work, but not all light, unskilled jobs in the national economy, as
per the VE's testimony.  (*Id.* at 25-26)

The court assigns no error in this regard.  Given the conflicts of record, the ALJ
was entitled to discredit Hosny and Yoder in favor of the agency physician's opinion
cited; he went a step further in finding that plaintiff could not do medium work, but only
light, unskilled work.

---

[17]The ALJ found that, although plaintiff's impairments could reasonably be
expected to produce the alleged symptoms, plaintiff's "statements concerning the
intensity, persistence and limiting effects of these symptoms are not entirely credible."
(D.I. 14 at 22)  This conclusion was the result of a credibility determination properly
made by the ALJ.

[18]A conclusion essentially adopted from Hosny's March 7, 2005 opinion.  (D.I. 14
at 374)

The court further notes the additional evidence supporting the ALJ's determination that plaintiff's impairments, alone or in combination, do not prevent him from doing light work. In June 2003, Hosny described plaintiff's fibromyalgia as "under reasonable control" with medications.[19] (*Id.* at 403) In August 2003, despite reporting pain, plaintiff told Gorra that he can walk a mile and a half. (*Id.* at 269) In February 2004, plaintiff was hospitalized following a walk in the woods that lasted "for hours." (*Id.* at 288) In February 2005, Swaminathan characterized plaintiff's fibromyalgia as inactive. (*Id.* at 314) Perhaps the most telling supporting evidence is Hosny's August 3, 2005 prescription that plaintiff "can work full time with no restrictions." (*Id.* at 441) In October 2005, Samaha noted that plaintiff was exercising and had lost two pounds doing so. (*Id.* at 485) In December 2005, plaintiff was trying to have a baby. (*Id.* at 512) Finally, in January 2006, plaintiff denied any difficulties walking around (or muscle pain) to Saberi. (*Id.* at 512)

Finally, the court addresses plaintiff's assertion that the ALJ failed to make a specific finding with respect to the combination of his impairments. *See* 42 U.S.C. § 423(d)(2)(B). Plaintiff is correct that no specific statement appears in the ALJ's opinion to this effect. The ALJ did make extensive findings with respect to plaintiff's medical records and, in "giving [plaintiff] every benefit of the doubt," limited him to performing only light work. The fact that he limited plaintiff's work to occupations having no

---

[19]An impairment cannot serve as the basis for disability if it can be reasonably controlled by treatment or medication. *See Dearth v. Barnhart,* 34 Fed. Appx. 874 (3d Cir. 2002) (citing *Gross v. Heckler,* 785 F.2d 1163, 1165-66 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling") and 20 C.F.R. § 404.1530 ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.")).

exposure to pulmonary irritants evidences a consideration of asthma; the ALJ's finding that plaintiff should perform only "simple, routine jobs" is, in fact, consistent with Yoder's opinion that plaintiff's pain can cause issues with concentration. More fundamentally, however, the foregoing evidence regarding plaintiff's RFC, including Hosny's August 3, 2005 prescription that plaintiff "can work full time with no restrictions," is commensurate with plaintiff's complaints of multiple ailments. Substantial evidence exists to support the ALJ's opinion that plaintiff maintains the RFC for light, unskilled work, and the ALJ's lack of further elaboration in this regard does not warrant remand.

## V. CONCLUSION

In view of the foregoing, substantial evidence supports the ALJ's determination that plaintiff is not disabled and is capable of light work. Plaintiff's motion for summary judgment (D.I. 16), therefore, is denied and defendant's motion for summary judgment (D.I. 19) is granted. An appropriate order shall issue.

29